IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Betty J. Martin, )<br> )<br>Plaintiff, )<br> )<br>vs. )<br> )<br>Michael J. Astrue, )<br>Commissioner of Social Security, )<br> )<br>Defendant. )<br>_____ ) | Civil Action No. 6:08-3006-DCN-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

### ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) benefits on June 7, 2004, respectively, alleging that she became unable to work on January 2, 2004. The applications were denied initially and on reconsideration by the Social Security Administration. On March 16, 2005, the plaintiff

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

requested a hearing. The administrative law judge, before whom the plaintiff, her attorney and a vocational expert appeared on January 18, 2008, considered the case *de novo*, and on March 21, 2008, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on August 18, 2008. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

(1)     The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

(2)     The claimant has not engaged in substantial gainful activity since January 2, 2004, her alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

(3)     The claimant has the following severe combination of impairments: chronic obstructive pulmonary disease and borderline to low average intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).

(4)     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)     After careful consideration of the entire record, I find that the claimant has no exertional limitations but would need to avoid even moderate exposure to fumes, odors, dust, gases or poor ventilation and would be limited to unskilled to semi-skilled work.

(6)     The claimant is capable of performing past relevant work as a cashier/stocker, stock clerk and a shoe salesperson. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 414.1565 and 416.965).

2

(7)     The claimant has not been under a disability, as defined in the Social Security Act, from January 2, 2004 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.


## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

3

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff has a seventh grade education (Tr. 145) and past work experience as a cashier/stocker at a convenience store; manager at a shoe store, movie theater, and convenience store; and sales associate at a shoe store (Tr. 100-07, 139). She claimed that she became disabled on January 2, 2004, due to chronic obstructive pulmonary disease ("COPD") (Tr. 138). She did not stop working at the substantial gainful activity level until May 15, 2004 (Tr. 99, 136, 138), making that the earliest possible onset date of disability.

The record reveals that during the plaintiff's working years, she received ongoing treatment for COPD, including at least one severe exacerbation in which she developed temporary respiratory and congestive heart failure (Tr. 165-82, 211-27, 354-94). She continued to smoke cigarettes daily (Tr. 165, 180-81, 219). Medical records also indicate a history of unspecified arthritis, migraine headaches, generalized anxiety, and complaints of back pain with no specific diagnosis (Tr. 180, 184-94, 288, 364-66). X-rays of her spine taken in late 2003 revealed only "minimal" degenerative changes and "mild to moderate" scoliosis (Tr. 366).

In July 2004, the plaintiff told Dr. Richard Crawley that she recently hurt her back and had seen a chiropractor, who adjusted her back and "told her it would be OK." She also said she smoked one-half pack of cigarettes per day, and that she had been dropped from a pharmaceutical research project because "her breathing was not quite bad

enough to meet their criteria." On examination, her lungs had fair breath sounds with expiratory wheezing. Her back was tender, but she had reasonable flexion and Dr. Crawley thought her back would "be OK" (Tr. 207).

In a daily activities questionnaire completed in July 2004, the plaintiff reported that she cared for her own personal needs, did housework with some help from her daughter or a friend, handled her financial responsibilities, made shopping lists for her daughter (who did all the shopping), read, played computer games, played cards, visited with friends or relatives, and drove her car short distances (Tr. 108-11).

In October 2004, State agency physician George Chandler, M.D., and psychologist Xanthia Harkness, Ph.D., reviewed the plaintiff's medical records and assessed her physical and mental limitations (Tr. 230-37, 238-50). Dr. Chandler determined that the plaintiff had no exertional limitations (Tr. 231), but needed to avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation (Tr. 234). Dr. Harkness found that the plaintiff's anxiety disorder was not severe (Tr. 238), as it produced only mild restriction of activities of daily living; no difficulties in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation (Tr. 248). Dr. Harkness noted that, according to treatment records, the plaintiff had a normal mental status, took Xanax (an anti-anxiety drug) primarily for sleep problems, and attributed her limited activities only to her physical impairments (Tr. 250).

In December 2004, the plaintiff sought emergency care for breathing difficulties and was treated on an outpatient basis for pneumonia (Tr. 254-64). She improved with nebulized Albuterol and Atrovent treatment (Tr. 255). Dr. Samuel J. Swad noted that the plaintiff "continue[d] to smoke despite a history of COPD and one episode of ending up on a ventilator" (Tr. 264).

In February 2005, State agency physician W.B. Hopkins, M.D., and psychologist Lisa Varner, Ph.D., reviewed the plaintiff's medical records and assessed her

physical and mental limitations (Tr. 265-72, 273-86). Dr. Hopkins determined that the plaintiff had no exertional limitations (Tr. 266), but needed to avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation (Tr. 269). Dr. Varner determined that the plaintiff's anxiety disorder was not severe (Tr. 273), as it produced only mild restriction of activities of daily living; no difficulties in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation (Tr. 283). Dr. Varner noted that the plaintiff only alleged disabling physical impairments, that she did not claim that her anxiety was getting worse, that she had a normal mental status during examinations, and that she had "no functional limitations due to anxiety" (Tr. 285).

In a form completed in February 2005, the plaintiff reported that she "stay[ed] on [her] oxygen and breathing machine about 95% of the time" (Tr. 123).[2]

In March 2005, the plaintiff presented to Dr. Ishfaq Shah for an initial office visit. She reported that she continued to smoke a pack of cigarettes per day, used oxygen at home only on an as-needed basis, and used her hand-held nebulizer four times per day and as needed. She reported fatigue, coughing on exertion, and chronic headaches and pain in her back and legs. On examination, her heart had a regular beat and her lungs had a "few" crackles and wheezes. Dr. Shah refilled her medications (Tr. 397).

In April 2005, the plaintiff was hospitalized for three days after developing a bronchospasm and hypoxia (low oxygen level) (Tr. 288, 318-53). Dr. Shah subsequently noted that the plaintiff also complained of "aches and pains" in her back and legs, and that she continued to smoke one pack of cigarettes per day. Examination revealed scattered wheezing, rhonchi (rattling sounds), and crepitations (crackling sounds) in both lungs, but the remainder of the examination, including an EKG of her heart, was "unremarkable" and

---

[2]While the plaintiff was instructed to use a hand-held nebulizer (a small device that provides respiratory medication via a mist that is inhaled) four times per day or as needed, there is no medical evidence that her physicians ordered oxygen therapy except on a temporary basis after her acute COPD exacerbations.

a chest x-ray showed no acute changes. Dr. Shah diagnosed a COPD exacerbation with bronchitis and influenza. The plaintiff's condition improved over the next 72 hours and she was discharged in stable condition with instructions to quit smoking. She was given a tapering dose of a corticosteroid, medications to alleviate her shortness of breath, inhalers, two liters of oxygen, and hand-held nebulizers to be used four times per day and as needed (Tr. 288-91). Dr. Shah then completed a form in which he circled "yes" or "no" answers indicating that the plaintiff would not be capable of even sedentary work; that she had a medical condition causing chronic pain that would impair her ability to perform daily activities and/or work and would increase with physical activity; that she had chronic fatigue and would require frequent rest periods; that these restrictions had persisted since March 2005; and that these restrictions were probably permanent. When asked to summarize findings, lab test results, x-rays, and diagnoses that supported the above restrictions, Dr. Shah reported that the plaintiff had "COPD with Chronic Respiratory Failure and Chronic back pains and Chronic Anxiety State" (Tr. 292-93). He did not elaborate further.

In June 2005, the plaintiff presented to psychologist Luther A. Diehl, Ph.D., at the request of her attorney, for an "[a]ssessment of intellectual, emotional, and personality factors affecting residual functional capacity for gainful employment." The plaintiff said that she had difficulty working due to her breathing problems. She said she currently smoked one-half pack of cigarettes per day, and Dr. Diehl noted that her records "indicated strong recommendations that this patient discontinue cigarette abuse because of her COPD." The plaintiff also said she took psychotropic medication (Xanax), but had not had any specific psychiatric treatment or counseling (Tr. 296). She said she had not done very well in school and was "not very interested" in it, that she did not have to repeat any grades, and that she simply quit school in the seventh grade. She reported holding jobs for up to five years at a time, said she was never terminated, and said she "usually would leave a job to get something better in terms of money or hours." The plaintiff said

8

that during a typical day, she would "usually do household chores such as wash[ing] a load of clothing," and that she continued to drive a car. She denied doing any cooking, vacuuming, watching television, or engaging in hobbies (Tr. 294-99).

Upon examination, Dr. Diehl found the plaintiff seemed to understand instructions, had a concrete but logical cognitive style, did not report any problems with short term memory, and was fully oriented. Wechsler series intelligence testing revealed a verbal IQ of 66, a performance IQ of 80, and a full scale IQ of 70. Dr. Diehl noted that these scores placed her "level of functioning within the Borderline Range of intellectual abilities," and noted that the 14-point discrepancy between the verbal and performance IQ suggested weakness in verbal areas and working memory. However, the plaintiff obtained a perfect score (recalling 15 of 15 items) on the Rey Memory Test. She had academic test scores equivalent to elementary school levels. Self-report tests indicated she had depression and anxiety. Dr. Diehl opined that the plaintiff's rehabilitation potential would be "adversely affected by her intellectual abilities and limited academic skills," and that her COPD would "certainly have a limiting affect in conducting any type of physical activity which this patient might be able to perform in a work setting." His psychological diagnoses were: generalized anxiety disorder, adjustment disorder with depressed mood, disorder of written expression, borderline intellectual functioning, and dependent personality features. Dr. Diehl then noted the criteria of Listings[3] 12.05(C) (mental retardation) and 12.06 (anxiety related disorders) (Tr. 298-304).

In September and November of 2005, Dr. Shah noted that the plaintiff had back and leg pains from degenerative arthritis and also had chronic anxiety. Respiratory examinations remained essentially unchanged from prior examinations (Tr. 397).

---

[3]The "listings" are a group of impairments set forth in the Commissioner's regulations at 20 C.F.R. pt. 404, subpt. P, app. 1, which are presumed to be disabling if all criteria are met or equaled.

9

In February 2006, the plaintiff sought emergency treatment for a persistent headaches, body aches, chest tightness, and a cough. A chest x-ray showed normal heart size, normal pulmonary vascularity, clear lungs, and no pleural effusion – in short, "no active disease." The attending physician noted the plaintiff's 38-year history of smoking one pack of cigarettes per day (Tr. 306-17).

At follow-up visits throughout 2006, Dr. Shah listed the plaintiff's subjective complaints of "aches and pains" and "nervousness and tension," and refilled her medications (Tr. 399-401).

In December 2006, the plaintiff was hospitalized for four days with a COPD exacerbation. Chest x-rays showed normal heart size, no active infiltration or consolidation in the lungs, no sign of active disease, and no change from prior studies. She was treated with corticosteroids and bronchodilators, and returned to her baseline status with clear lungs by the time of discharge (Tr. 403-17).

Handwritten treatment notes indicate that the plaintiff saw Dr. Shah periodically throughout 2007 and into early 2008 (Tr. 425-26, 429). It appears, to the best of the Commissioner's ability to decipher these nearly illegible notes, that the plaintiff reported back pain and ongoing COPD symptoms, and that Dr. Shah refilled her medications (Tr. 425-26, 429). A chest x-ray taken in April 2007 revealed clear lungs, normal pulmonary vascularity, normal heart size, no pleural effusion, and no active disease (Tr. 430).

In December 2007, the plaintiff presented to psychologist James N. Ruffing, Psy.D., for a consultation in connection with her claims for benefits. The plaintiff initially said she had experienced depression for the past 17 years, but when she was later asked whether she felt depressed, she said "no." She reported that she could care for her personal needs, drive a car, attend church, go to stores by herself, participate in meal preparation, and read the newspaper. She said she smoked one-half pack of cigarettes per

day. Mental status examination revealed that the plaintiff was alert, oriented, involved, responsive, and articulate, with an affect and mood "within normal limits," relevant and coherent thoughts, intact memory, and the ability to attend and focus without distraction. Dr. Ruffing administered various psychometric tests, including a Wechsler series intelligence test, and found the plaintiff had a verbal IQ of 68, a performance IQ of 76, and a full scale IQ of 69. He noted as follows:

> The 95 percent confidence interval for the Full Scale IQ of 69 is 66 to 74, and these would be the reasonable limits for the range within which her true Full Scale IQ would lie. The Full Scale IQ is lower[] than what would have been expected based on the claimant's vocational and academic history. For example, she was a manager at a shoe store for 3 years. In addition, she represents activities of daily living and functioning, which would be higher than what would be expected with an individual producing a Full Scale IQ of 69. It is the opinion of this examiner that current test results are underestimate and that overall level of intellectual capacity is likely on the borderline if not lower average levels [of] intellectual functioning.

(Tr. 420). Dr. Ruffing further observed that the plaintiff's reading test scores, which were equivalent to the third-grade level, appeared to underestimate her actual reading ability, based on her "stated ability to read the majority of the newspaper print." He noted that she should be able to complete job application forms or read texts such as instruction manuals. Dr. Ruffing concluded that the plaintiff was able to understand and respond to the spoken word, focus and attend without distraction from internal or external stimuli, perform "repetitive to complex tasks[,] and [] understand, remember, and carry out detailed instructions." Dr. Ruffing then completed a Medical Source Statement in which he opined that the plaintiff had no limitations in any of the 10 mental functional areas listed on the form (Tr. 418-24).

At the January 2008 administrative hearing, the plaintiff testified that she was currently 50 years old (Tr. 480), and that she last worked on January 2, 2004 (Tr. 483). She

said all her past jobs were "standing up jobs," but that she could not perform those jobs now even if she had a stool, because it was more difficult for her to get up and down from a stool than to stand all day (Tr. 495). In addition to her COPD, the plaintiff testified that she was disabled due to "crippling" arthritis, "bad nerve problems," and congestive heart failure (Tr. 487).

Regarding her COPD, the plaintiff testified that she had been using oxygen continuously for only one month (Tr. 488, 501). She testified that she had previously used oxygen, "but not as often" as currently (Tr. 488). She said, "I'd use it for like two days and then I'd probably skip like four and then use it for two days and I wouldn't be on it 24/7" (Tr. 488). She testified that she had daily coughing spells that were triggered by smelling perfumes or smoke, or walking for 10 to 20 minutes (Tr. 490). She testified that she still smoked one-half pack of cigarettes per day, and acknowledged that "[e]verybody" had encouraged her to quit (Tr. 491).

Regarding her other impairments, the plaintiff testified that medications did not help her back pain, and she rated her daily pain as an "eight" on a scale of one to 10 (Tr. 493), but she denied needing any assistive devices to walk (Tr. 504). She testified that her anxiety was worse, and that she was worried that her house was going to burn down or be broken into (Tr. 499).

As to her activities, the plaintiff testified that she drove short distances to the grocery store or Dollar General store a few times a week (Tr. 482). She testified that she used her nebulizer at 7:00 a.m., noon, around 4:00 p.m., and around 8:00 p.m., and that each treatment took seven minutes (Tr. 492). She also testified that she cooked, washed dishes, and picked up her grandson's toys off the floor (Tr. 497). She said that after picking up things for five or 10 minutes, she would either start coughing or go outside to smoke a cigarette (Tr. 498). She testified that she tried to avoid shopping (Tr. 498). She also

testified that she attended church weekly, but denied engaging in any other activities, including watching more than a few minutes of television or listening to music (Tr. 502).

As to her functional abilities, the plaintiff testified that she could read the newspaper and write a letter or grocery list (Tr. 480), and that she had taken a written driver's license test (Tr. 482). She testified that her back pain prevented her from sitting for more than 10 minutes, that she could not bend at all, and that she could lift up to 20 pounds (Tr. 493). She said that could stand "about an hour more than [she could] sit" (Tr. 495).

The vocational expert, G. Mark Leaptrot, testified regarding the exertion and skill requirements of the plaintiff's past relevant work (Tr. 506). He testified that (according to the DOT[4]), the classifications of her past jobs – as they are generally performed – were as follows: the job of cashier was light and unskilled;[5] the job of stock clerk was heavy and semi-skilled; the job of convenience store manager was light and skilled; the job of movie theater concessions manager was light and skilled; and the job of shoe salesperson was light and semi-skilled (Tr. 50). *See* DOT 211.462-010 (cashier), 299.367-014 (stock clerk), 185.167-046 (retail manager), 187.167-230 (manager, food concession), 261.357-062 (shoes salesperson).

The ALJ asked Mr. Leaptrot to consider a hypothetical individual of the plaintiff's age, education, and past work history, who had no exertional limitations, could perform only unskilled to semi-skilled work, and should avoid even moderate exposure to fumes, odors, dust, gases, poor ventilation, and cigarette smoke (Tr. 507). Mr. Leaptrot testified that such an individual could perform the plaintiff's past jobs of cashier, stock clerk, and shoe salesperson (Tr. 507).

---

[4]U.S. Dep't of Labor, *Dictionary of Occupational Titles* (4th ed. 1991) ("DOT").

[5]*See* 20 C.F.R. §§ 404.1567 (exertional definitions), 404.1568 (skill definitions).

In response to further questioning, Mr. Leaptrot testified that an individual with the limitations assessed by Dr. Shah (Tr. 292-93) and "marked" difficulties in maintaining concentration, persistence, and pace could not perform any work (Tr. 508). In addition, Mr. Leaptrot testified that individuals are typically allowed 15-minute breaks after two hours and 30-minute breaks for lunch, and that the need for excessive breaks beyond that would not be tolerated in a workplace (Tr. 508-09).

## ANALYSIS

The plaintiff alleges disability since January 2, 2004, due to chronic obstructive pulmonary disease ("COPD"). She was 46 years old on her alleged onset date, and she has a sixth grade education (Tr. 480). The ALJ found that the plaintiff's COPD and borderline to low average intellectual functioning were severe impairments (Tr. 19). The ALJ further found that the plaintiff had no exertional limitations but would need to avoid even moderate exposure to fumes, odors, dust, gases or poor ventilation and would be limited to unskilled to semi-skilled work (Tr. 22). Thus, the ALJ found that the plaintiff could perform her past relevant work as cashier/stocker (light, semi-skilled), stock clerk (heavy, semi-skilled), and shoe salesperson (light, semi-skilled). The plaintiff argues that the ALJ erred by (1) failing to properly consider whether she met the requirements of Listing 12.05(C); (2) failing to properly consider her residual functional capacity ("RFC"); and (3) failing to give proper weight to the opinion of her treating physician.

### *Listing 12.05(C)*

The plaintiff alleges that the ALJ erred by failing to perform a proper listing analysis. Specifically, she argues that her impairments meet Listing 12.05(C). *See* 20 C.F.R. Appendix 1, Subpart P, Listing 12.05(C). The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering

14

your age, education, and work experience." 20 C.F.R. § 404.1520(d). A listing analysis includes identifying the relevant listed impairments and comparing the criteria with the evidence of the plaintiff's symptoms. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that "[w]ithout such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination"); *Beckman v. Apfel*, C.A. No. WMN-99-3696, 2000 WL 1916316, *9 (D. Md. 2000) (finding that where there is "ample factual support in the record" for a particular listing, the ALJ should perform a listing analysis).

Listing 12.05 is the listing related to mental retardation. Mental retardation refers to "a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period [before age 22]." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05. Further, "[t]he required level of severity for this disorder is met when the requirements of A, B, C, or D are satisfied." *Id.* A claimant is to be found disabled under Listing 12.05(C) if he or she has the following: "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." *Id.*

The ALJ's finding that the plaintiff did not meet the diagnostic description for mental retardation outlined in the introductory paragraph of Listing 12.05(C) is based upon substantial evidence. The introductory paragraph requires "a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period [before age 22]." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05. The introductory paragraph criteria must be satisfied in addition to having the requisite IQ scores and another severe impairment. This is consistent with the American Psychiatric Association's position that "mental retardation is not diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning." *See*

15

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders IV* (Text Revision 2000), available at Stat!Ref Library Intranet Electronic Library.

While the plaintiff contends the ALJ "performed no analysis of this listing" (pl. brief 4), the ALJ did consider the listing and found as follows:

> I agree with Dr. Ruffing's assessment that Ms. Martin's activities of daily living and employment history approximate her true level of intellectual functioning at the borderline or even low average range. He felt she could read an instruction manual or newspaper with comprehension. Her intellectual limitations thus clearly do not meet Listing 12.05(C). . .

 (Tr. 22).

The plaintiff was evaluated by Dr. Diehl on June 27, 2005, and IQ testing showed that she had a Verbal IQ of 66, a Performance IQ of 80, and a Full Scale IQ of 70 (Tr. 294-304). Dr. Ruffing evaluated the plaintiff on December 26, 2007, and his testing showed that the plaintiff had a Verbal IQ of 68, a Performance IQ of 76, and a Full Scale IQ of 69 (Tr. 418). Both doctors diagnosed the plaintiff with borderline intellectual functioning (and possibly even "low average" intellectual functioning per Dr. Ruffing), rather than mental retardation, and neither psychologist ever assessed any significant deficits in adaptive functioning. Dr. Ruffing specifically pointed out that the plaintiff's IQ scores underestimated her actual abilities, as evidenced by her demonstrated ability to work as a manager (a semi-skilled to skilled job) for several years (*see* Tr. 298) and her "activities of daily living and functioning, which [were] higher than what would be expected" of an individual with her IQ (Tr. 430). As argued by the defendant, the record contains no evidence whatsoever that the plaintiff had any intellectual difficulty performing any of her past relevant jobs. On the contrary, she indicated that she usually quit her jobs in order to "get something better in terms of money or hours" (Tr. 298). Furthermore, her activities of daily living included driving, cooking, doing laundry, shopping, and paying bills. She also visited with family on occasion and drove to church. Based upon the foregoing, the ALJ's

finding that the plaintiff did not meet Listing 12.05(C) was appropriate and is based upon substantial evidence.

**Residual Functional Capacity**

The plaintiff next argues that the ALJ failed to consider all of her impairments in assessing her RFC.

> The Residual Functional Capacity ("RFC") assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work- related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.
> . . .

SSR 96-8p, 1996 WL 374184, *7.

In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

17

The plaintiff specifically argues that the ALJ failed to consider her exertional limitations caused by degenerative arthritis and COPD and failed to address her ability to work on a regular and continuing basis. The ALJ found that the plaintiff had no exertional limitations but would need to avoid even moderate exposure to fumes, odors, dust, gases or poor ventilation and would be limited to unskilled to semi-skilled work (Tr. 22). In evaluating her physical limitations (Tr. 19-22, 23-24), the ALJ discussed the plaintiff's COPD history, including her hospitalizations, temporary exacerbations, various diagnostic results, clinical findings about her lung sounds, her intermittent use of oxygen therapy, and the frequency of her pulmonology appointments (Tr. 19-20, 24). The ALJ also considered the plaintiff's subjective complaints of back pain and arthritis (Tr. 23) and found that the plaintiff "lacks credibility generally" noting that she "has repeatedly been contradictory and inconsistent" (Tr. 24). However, as argued by the plaintiff, the ALJ failed to discuss her ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis and failed to describe the maximum amount of each work-related activity that she can perform based on the evidence in the record. Dr. Shah noted low back pain in his records from 2005-2007 (Tr. 396-97, 431-32). Also, the plaintiff testified that she would have a hard time lifting more than 20 pounds because of her back pain and that because of her COPD walking for 20 minutes caused her to lose her breath (Tr. 490, 493). Upon remand, the ALJ should be instructed to consider all the evidence regarding exertional limitations and to include in his RFC assessment a description of the maximum amount of each work-related activity that the plaintiff can perform.

### Treating Physician

The plaintiff argues that the ALJ failed to properly consider the opinion of Dr. Shah. The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

In April 2005, Dr. Shah, who had begun treating the plaintiff in March 2005, completed a form in which he circled "yes" or "no" answers indicating that the plaintiff would not be capable of even sedentary work; that she had a medical condition causing chronic pain that would impair her ability to perform daily activities and/or work and would increase with physical activity; that she had chronic fatigue and would require frequent rest periods; that these restrictions had persisted since March 2005; and that these restrictions were probably permanent. When asked to summarize findings, lab test results, x-rays, and diagnoses that supported the above restrictions, Dr. Shah reported that the plaintiff had "COPD with Chronic Respiratory Failure and Chronic back pains and Chronic Anxiety State" (Tr. 292-93).

The ALJ concluded that Dr. Shah's opinion amounted only to "bald assertions, without any factual support" and accorded it little weight (Tr. 24). The ALJ pointed out that Dr. Shah failed to specify what medical condition caused the plaintiff to experience chronic pain that would limit her to the extent alleged by Dr. Shah (Tr. 24). He noted that, while Dr. Shah's September 2005 treatment note indicated that the plaintiff had "degenerative arthritis," no x-rays, MRI scans, other imaging techniques, straight leg-raise tests, or other clinical maneuvers backed up that statement or supported the plaintiff's complaints of intense pain (Tr. 23). As noted by the defendant, the only objective evidence demonstrating any degenerative condition at all was an x-ray taken in late 2003, which revealed only "minimal" lumbar degeneration (Tr. 366). The ALJ pointed out, "[w]hen asked to summarize findings, lab tests, xrays or anything else supporting his contention that the claimant suffered from pain that precluded work even at the sedentary level of exertion, [Dr. Shah] merely stated 'chronic back pain'" (Tr. 24). Thus, it appears Dr. Shah's opinion was based primarily on the plaintiff's subjective complaints, which provided the ALJ with a valid basis for rejecting the opinion. *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005) (as the treating physician had not performed any physical tests on claimant's hands, his

opinion that she had hand limitations was based on claimant's subjective complaints and could be rejected).

Based upon the foregoing, this court finds that the ALJ properly considered Dr. Shah's opinion, and his decision to give the opinion little weight is based upon substantial evidence.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe
United States Magistrate Judge

September 25, 2009

Greenville, South Carolina