**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| Betty J. Martin, | ) | C/A No. 6:08-3006-DCN-WMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER & OPINION** |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on the United States magistrate judge's report and
recommendation, made in accordance with 28 U.S.C. § 636(b)(1)(B), that this court
reverse and remand the decision of the Commissioner denying plaintiff's application for
disability insurance benefits (DIB) and supplemental security income (SSI) under Titles
II and XVI of the Social Security Act, 42 U.S.C. §§ 410-33, 1381-83. The Commissioner
has filed a written objection to the report and recommendation. For the reasons set forth
below, the court adopts the report and recommendation of the magistrate judge and
reverses and remands the case for further consideration by the Commissioner.

## I. BACKGROUND

### A. Procedural History

Plaintiff filed applications for DIB and SSI benefits on June 7, 2004, alleging that
she became unable to work on January 2, 2004. The applications were denied initially
and on reconsideration by the Social Security Administration. On March 16, 2005,
plaintiff requested a hearing before an administrative law judge (ALJ), who, on March

21, 2008, found that plaintiff was not under a disability as defined in the Social Security

Act. In making his determination that plaintiff is not entitled to benefits, the ALJ made

the following findings:

> (1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.
>
> (2) The claimant has not engaged in substantial gainful activity since January 2, 2004, her alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).
>
> (3) The claimant has the following severe combination of impairments: chronic obstructive pulmonary disease and borderline to low average intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).
>
> (4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> (5) After careful consideration of the entire record, I find that the claimant has no exertional limitations but would need to avoid even moderate exposure to fumes, odors, dust, gases or poor ventilation and would be limited to unskilled to semi-skilled work.
>
> (6) The claimant is capable of performing past relevant work as a cashier/stocker, stock clerk and a shoe salesperson. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 414.1565 and 416.965).
>
> (7) The claimant has not been under a disability, as defined in the Social Security Act, from January 2, 2004 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

The ALJ's decision became the final decision of the Commissioner when the Appeals

Council approved the decision on August 18, 2008. The plaintiff then filed this action

for judicial review, raising the following assertions of error:

> I.      THE ALJ FAILED TO CONSIDER THAT PLAINTIFF MEETS THE REQUIREMENTS OF LISTING 12.05C.

II.    THERE IS NO SUBSTANTIAL EVIDENCE TO SUPPORT THE ADMINISTRATIVE LAW JUDGE'S [RESIDUAL FUNCTIONAL CAPACITY] ASSESSMENT OF THE CLAIMANT.

III.   THE ADMINISTRATIVE LAW JUDGE ERRED IN REFUSING TO ASSIGN ANY WEIGHT TO THE OPINION OF CLAIMANT'S TREATING PHYSICIAN.

The magistrate judge rejected plaintiff's first and third arguments, finding that the ALJ properly evaluated plaintiff's impairments under the listings and properly discounted the opinion of plaintiff's treating physician. Regarding plaintiff's second argument, the magistrate judge found that the ALJ had erred in assessing plaintiff's residual functional capacity (RFC) and has recommended that the ALJ's decision be reversed and the case remanded for further consideration. The Commissioner has filed an objection to this portion of the magistrate judge's report, which this court will review de novo.

**B. Plaintiff's History**

Plaintiff has a seventh grade education, and her past work experience includes cashier/stocker at a convenience store; manager at a shoe store, movie theater, and convenience store; and sales associate at a shoe store. Tr. 100-07, 139, 145. Plaintiff alleges she became disabled on January 2, 2004, due to chronic obstructive pulmonary disease (COPD). Tr. 138.

Plaintiff's medical history reveals that during her working years she received ongoing treatment for COPD, including at least one severe exacerbation in which she developed temporary respiratory and congestive heart failure. Tr. 165-82, 211-27, 354-94. Despite her condition, plaintiff continued to smoke cigarettes daily. Tr. 165, 180-81, 219. Medical records also indicate a history of unspecified arthritis, migraine headaches,

generalized anxiety, and complaints of back pain with no specific diagnosis. Tr. 180,

184-94, 288, 364-66. X-rays of plaintiff's spine taken in late 2003 revealed "minimal"

degenerative changes and "mild to moderate" scoliosis. Tr. 366.

In July 2004, plaintiff told Dr. Richard Crawley that she recently hurt her

back and had seen a chiropractor, who adjusted her back and "told her it would be OK."

Plaintiff also said she smoked one-half pack of cigarettes per day, and that she had been

dropped from a pharmaceutical research project because "her breathing was not quite bad

enough to meet their criteria." Examination revealed that plaintiff's lungs had fair breath

sounds with expiratory wheezing. Plaintiff's back was tender, but she had reasonable

flexion, and Dr. Crawley thought her back would "be OK." Tr. 207.

In a daily activities questionnaire completed in July 2004, plaintiff reported

that she cared for her own personal needs, did housework with some help from her

daughter or a friend, handled her financial responsibilities, made shopping lists for her

daughter (who did all the shopping), read, played computer games, played cards, visited

with friends or relatives, and drove her car short distances. Tr. 108-11.

In October 2004, state agency physician George Chandler, M.D., and

psychologist Xanthia Harkness, Ph.D., reviewed plaintiff's medical records and

assessed her physical and mental limitations. Tr. 230-37, 238-50. Dr. Chandler

determined that plaintiff had no exertional limitations, but needed to avoid

even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. Tr. 231, 234.

Dr. Harkness found that plaintiff's anxiety disorder was not severe, as it produced only

mild restriction of activities of daily living; no difficulties in maintaining social

functioning, concentration, persistence, or pace; and no episodes of decompensation. Tr. 238, 248. Dr. Harkness noted that, according to treatment records, plaintiff had a normal mental status, took Xanax (an anti-anxiety drug) primarily for sleep problems, and attributed her limited activities to her physical impairments. Tr. 250.

In December 2004, plaintiff sought emergency care for breathing difficulties and was treated on an outpatient basis for pneumonia. Tr. 254-64. She improved with nebulized Albuterol and Atrovent treatment. Tr. 255. Dr. Samuel J. Swad noted that plaintiff "continue[d] to smoke despite a history of COPD and one episode of ending up on a ventilator." Tr. 264.

In February 2005, state agency physician W.B. Hopkins, M.D., and psychologist Lisa Varner, Ph.D., reviewed plaintiff's medical records and assessed her physical and mental limitations. Tr. 265-72, 273-86. Dr. Hopkins determined that plaintiff had no exertional limitations, but needed to avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. Tr. 266, 269. Dr. Varner determined that plaintiff's anxiety disorder was not severe, as it produced only mild restriction of activities of daily living; no difficulties in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation. Tr. 273, 283. Dr. Varner noted that plaintiff only alleged disabling physical impairments, that she did not claim that her anxiety was getting worse, that she had a normal mental status during examinations, and that she had "no functional limitations due to anxiety." Tr. 285. In a form completed in February 2005, plaintiff reported that she "stay[ed] on [her] oxygen and breathing machine about 95% of the time." Tr. 123.

5

In March 2005, plaintiff presented to Dr. Ishfaq Shah for an initial office visit. She reported that she continued to smoke a pack of cigarettes per day, used oxygen at home only on an as-needed basis, and used her hand-held nebulizer four times per day and as needed. Plaintiff reported fatigue, coughing on exertion, and chronic headaches and pain in her back and legs. On examination, plaintiff's heart had a regular beat and her lungs had a "few" crackles and wheezes. Dr. Shah refilled her medications. Tr. 397.

In April 2005, plaintiff was hospitalized for three days after developing a bronchospasm and hypoxia (low oxygen level). Tr. 288, 318-53. Dr. Shah subsequently noted that plaintiff also complained of "aches and pains" in her back and legs, and that she continued to smoke one pack of cigarettes per day. Examination revealed scattered wheezing, rhonchi (rattling sounds), and crepitations (crackling sounds) in both lungs, but the remainder of the examination, including an EKG of her heart, was "unremarkable" and a chest x-ray showed no acute changes. Dr. Shah diagnosed a COPD exacerbation with bronchitis and influenza. Plaintiff's condition improved over the next seventy-two hours, and she was discharged in stable condition with instructions to quit smoking. She was given a tapering dose of a corticosteroid, medications to alleviate her shortness of breath, inhalers, two liters of oxygen, and hand-held nebulizers to be used four times per day and as needed. Tr. 288-91. Dr. Shah then completed a form in which he circled "yes" or "no" answers indicating that plaintiff would not be capable of even sedentary work; that she had a medical condition causing chronic pain that would impair her ability to perform daily activities and/or work and would increase with physical activity; that she had chronic fatigue and would require frequent rest

periods; that these restrictions had persisted since March 2005; and that these restrictions were probably permanent. When asked to summarize findings, lab test results, x-rays, and diagnoses that supported the above restrictions, Dr. Shah reported that plaintiff had "COPD with Chronic Respiratory Failure and Chronic back pains and Chronic Anxiety State." Tr. 292-93.

In June 2005, plaintiff presented to psychologist Luther A. Diehl, Ph.D., at the request of her attorney, for an "[a]ssessment of intellectual, emotional, and personality factors affecting residual functional capacity for gainful employment." Plaintiff said that she had difficulty working due to her breathing problems. She said she currently smoked one-half pack of cigarettes per day, and Dr. Diehl noted that her records "indicated strong recommendations that this patient discontinue cigarette abuse because of her COPD." Plaintiff also said she took psychotropic medication (Xanax), but had not had any specific psychiatric treatment or counseling. Tr. 296. Plaintiff said she had not done very well in school and was "not very interested" in it, that she did not have to repeat any grades, and that she simply quit school in the seventh grade. She reported holding jobs for up to five years at a time, said she was never terminated, and said she "usually would leave a job to get something better in terms of money or hours." Plaintiff said that during a typical day, she would "usually do household chores such as wash[ing] a load of clothing," and that she continued to drive a car. She denied doing any cooking, vacuuming, watching television, or engaging in hobbies. Tr. 294-99.

Upon examination, Dr. Diehl found that plaintiff seemed to understand instructions, had a concrete but logical cognitive style, did not report any problems with

7

short term memory, and was fully oriented. Wechsler series intelligence testing revealed a verbal IQ of 66, a performance IQ of 80, and a full scale IQ of 70. Dr. Diehl noted that these scores placed plaintiff's "level of functioning within the Borderline Range of intellectual abilities," and noted that the fourteen-point discrepancy between the verbal and performance IQ suggested weakness in verbal areas and working memory. However, plaintiff obtained a perfect score (recalling fifteen of fifteen items) on the Rey Memory Test. She had academic test scores equivalent to elementary school levels. Self-report tests indicated she had depression and anxiety. Dr. Diehl opined that plaintiff's rehabilitation potential would be "adversely affected by her intellectual abilities and limited academic skills," and that her COPD would "certainly have a limiting affect in conducting any type of physical activity which this patient might be able to perform in a work setting." His psychological diagnoses were: generalized anxiety disorder, adjustment disorder with depressed mood, disorder of written expression, borderline intellectual functioning, and dependent personality features. Dr. Diehl then noted the criteria of Listings 12.05(C) (mental retardation) and 12.06 (anxiety related disorders). Tr. 298-304.

In September and November 2005, Dr. Shah noted that plaintiff had back and leg pains from degenerative arthritis and also had chronic anxiety. Respiratory examinations remained essentially unchanged from prior examinations. Tr. 397.

In February 2006, plaintiff sought emergency treatment for persistent headaches, body aches, chest tightness, and a cough. A chest x-ray showed normal heart size, normal pulmonary vascularity, clear lungs, and no pleural effusion—in short, "no active

disease." The attending physician noted plaintiff's thirty-eight-year history of smoking one pack of cigarettes per day. Tr. 306-17. At follow-up visits throughout 2006, Dr. Shah listed the plaintiff's subjective complaints of "aches and pains" and "nervousness and tension," and refilled her medications. Tr. 399-401.

In December 2006, plaintiff was hospitalized for four days with a COPD exacerbation. Chest x-rays showed normal heart size, no active infiltration or consolidation in the lungs, no sign of active disease, and no change from prior studies. Plaintiff was treated with corticosteroids and bronchodilators, and returned to her baseline status with clear lungs by the time of discharge. Tr. 403-17.

Handwritten treatment notes indicate that plaintiff saw Dr. Shah periodically throughout 2007 and into early 2008. Tr. 425-26, 429. Plaintiff reported back pain and ongoing COPD symptoms, and that Dr. Shah refilled her medications. Tr. 425-26, 429. A chest x-ray taken in April 2007 revealed clear lungs, normal pulmonary vascularity, normal heart size, no pleural effusion, and no active disease. Tr. 430.

In December 2007, plaintiff presented to psychologist James N. Ruffing, Psy.D., for a consultation in connection with her claims for benefits. Plaintiff initially said she had experienced depression for the past seventeen years, but when she was later asked whether she felt depressed, she said "no." She reported that she could care for her personal needs, drive a car, attend church, go to stores by herself, participate in meal preparation, and read the newspaper. Plaintiff said she smoked one-half pack of cigarettes per day. Mental status examination revealed that plaintiff was alert, oriented, involved, responsive, and articulate, with an affect and mood "within normal limits,"

relevant and coherent thoughts, intact memory, and the ability to attend and focus without distraction. Dr. Ruffing administered various psychometric tests, including a Wechsler series intelligence test, and found the plaintiff had a verbal IQ of 68, a performance IQ of 76, and a full scale IQ of 69. He noted as follows:

> The 95 percent confidence interval for the Full Scale IQ of 69 is 66 to 74, and these would be the reasonable limits for the range within which her true Full Scale IQ would lie. The Full Scale IQ is lower[] than what would have been expected based on the claimant's vocational and academic history. For example, she was a manager at a shoe store for 3 years. In addition, she represents activities of daily living and functioning, which would be higher than what would be expected with an individual producing a Full Scale IQ of 69. It is the opinion of this examiner that current test results are underestimated and that overall level of intellectual capacity is likely on the borderline if not lower average levels [of] intellectual functioning.

Tr. 420. Dr. Ruffing further observed that plaintiff's reading test scores, which were equivalent to the third-grade level, appeared to underestimate her actual reading ability, based on her "stated ability to read the majority of the newspaper print." He noted that she should be able to complete job application forms or read texts such as instruction manuals. Dr. Ruffing concluded that plaintiff was able to understand and respond to the spoken word, focus and attend without distraction from internal or external stimuli, perform "repetitive to complex tasks[,] and [] understand, remember, and carry out detailed instructions." Dr. Ruffing then completed a Medical Source Statement in which he opined that the plaintiff had no limitations in any of the ten mental functional areas listed on the form. Tr. 418-24.

At the January 2008 administrative hearing, plaintiff testified that she was fifty years old, and that she last worked on January 2, 2004. Tr. 480, 483. She said all her past jobs were "standing up jobs," but that she could not perform those jobs now even if

she had a stool, because it was more difficult for her to get up and down from a stool than to stand all day.  Tr. 495.  In addition to her COPD, plaintiff testified that she was disabled due to "crippling" arthritis, "bad nerve problems," and congestive heart failure.  Tr. 487.

Regarding her COPD, plaintiff testified that she had been using oxygen continuously for only one month.  Tr. 488, 501. She testified that she had previously used oxygen, "but not as often" as currently.  Tr. 488.  She said, "I'd use it for like two days and then I'd probably skip like four and then use it for two days and I wouldn't be on it 24/7."  Tr. 488.  She testified that she had daily coughing spells that were triggered by smelling perfumes or smoke, or walking for ten to twenty minutes.  Tr. 490.  Plaintiff noted that she still smoked one-half pack of cigarettes per day, and acknowledged that "[e]verybody" had encouraged her to quit.  Tr. 491.

Regarding her other impairments, plaintiff testified that medications did not help her back pain, and she rated her daily pain as an "eight" on a scale of one to ten, but she denied needing any assistive devices to walk.  Tr. 493, 504.  She testified that her anxiety was worse, and that she was worried that her house was going to burn down or be broken into.  Tr. 499.

As to her activities, plaintiff testified that she drove short distances to the grocery store or Dollar General store a few times a week.  Tr. 482.  She testified that she used her nebulizer at 7:00 a.m., noon, around 4:00 p.m., and around 8:00 p.m., and that each treatment took seven minutes.  Tr. 492.  She also testified that she cooked, washed dishes, and picked up her grandson's toys off the floor.  Tr. 497.  She said that after

picking up things for five or ten minutes, she would either start coughing or go outside to smoke a cigarette. Tr. 498. She testified that she tried to avoid shopping. Tr. 498. She also testified that she attended church weekly, but denied engaging in any other activities, including watching more than a few minutes of television or listening to music. Tr. 502. As to her functional abilities, plaintiff testified that she could read the newspaper and write a letter or grocery list, and that she had taken a written driver's license test. Tr. 480, 482. She testified that her back pain prevented her from sitting for more than ten minutes, that she could not bend at all, and that she could "probably" lift up to twenty pounds "at most." Tr. 493. She said that could stand "about an hour more than [she could] sit." Tr. 495.

The vocational expert, G. Mark Leaptrot, testified regarding the exertion and skill requirements of plaintiff's past relevant work. Tr. 506. He testified that the classifications of her past jobs, as they are generally performed, were as follows: the job of cashier was light and unskilled; the job of stock clerk was heavy and semi-skilled; the job of convenience store manager was light and skilled; the job of movie theater concessions manager was light and skilled; and the job of shoe salesperson was light and semi-skilled. Tr. 506. See U.S. Dep't of Labor, *Dictionary of Occupational Titles* (4th ed. 1991) 211.462-010 (cashier), 299.367-014 (stock clerk), 185.167-046 (retail manager), 187.167-230 (manager, food concession), 261.357-062 (shoes salesperson).

The ALJ asked Mr. Leaptrot to consider a hypothetical individual of plaintiff's age, education, and past work history, who had no exertional limitations, could perform only unskilled to semi-skilled work, and should avoid even moderate exposure to fumes,

12

odors, dust, gases, poor ventilation, and cigarette smoke. Tr. 507. Mr. Leaptrot testified

that such an individual could perform plaintiff's past jobs of cashier, stock clerk, and

shoe salesperson. Tr. 507.

In response to further questioning, Mr. Leaptrot testified that an individual with

the limitations assessed by Dr. Shah and difficulties in maintaining concentration,

persistence, and pace could not perform any work. Tr. 292-93, 508. In addition, Mr.

Leaptrot testified that individuals are typically allowed fifteen-minute breaks after two

hours and thirty-minute breaks for lunch, and that the need for excessive breaks would

not be tolerated in a workplace. Tr. 508-09.

## II. STANDARD OF REVIEW

This court is charged with conducting a de novo review of any portion of the

magistrate judge's report to which a specific, written objection is made. 28 U.S.C. §

636(b)(1). A party's failure to object is accepted as agreement with the conclusions of

the magistrate judge. See Thomas v. Arn, 474 U.S. 140 (1985). This court is not

required to review, under a de novo standard, or any other standard, the factual findings

and legal conclusions of the magistrate judge to which the parties have not objected. See

id. at 149-50. A party's general objections are not sufficient to challenge a magistrate

judge's findings. Howard v. Secretary of Health & Human Servs., 932 F.2d 505, 508-09

(6th Cir. 1991). The recommendation of the magistrate judge carries no presumptive

weight, and the responsibility to make a final determination remains with this court.

Mathews v. Weber, 423 U.S. 261, 270 (1976). This court may accept, reject, or modify

the report of the magistrate judge, in whole or in part, or may recommit the matter to him

13

with instructions for further consideration. 28 U.S.C. § 636(b)(1).

Although this court may review the magistrate judge's recommendation de novo, judicial review of the Commissioner's final decision regarding disability benefits "is limited to determining whether the findings of the [Commissioner] are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" has been defined as,

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Id. (internal citations omitted). "[I]t is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the [Commissioner] if his decision is supported by substantial evidence." Id. Instead, when substantial evidence supports the Commissioner's decision, this court must affirm that decision even if it disagrees with the Commissioner. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). "Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." Hays, 907 F.2d at 1456.

### III.  DISCUSSION

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 423(d)(1)(A).  The Social Security Regulations establish a sequential evaluation

process to determine whether a claimant is disabled.  See 20 C.F.R. §§ 404.1520,

416.920.  Under this process, the ALJ must determine, in sequence: (1) whether the

claimant is currently engaged in substantial gainful activity; (2) if not, whether the

claimant has a severe impairment; (3) if so, whether that severe impairment meets or

equals an illness contained in 20 C.F.R. Part 4, Subpart P, Appendix 1, which warrants a

finding of disability without considering vocational factors; (4) if not, whether the

impairment prevents him or her from performing past relevant work; and (5) if so,

whether the claimant is able to perform other work considering both his remaining

physical and mental capacities (defined as Residual Functional Capacity or "RFC") and

his vocational capabilities (age, education, and past work experience) to adjust to a new

job.  Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); see also Pass v. Chater, 65

F.3d 1200, 1203 (4th Cir. 1995) (quoting 20 C.F.R. § 416.920).  The applicant bears the

burden of production and proof during the first four steps of the inquiry.  Pass, 65 F.3d at

1203 (citing Hunder v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).  If the sequential

evaluation process proceeds to the fifth step, the burden shifts to the Commissioner to

show that other work is available in the national economy that the claimant could

perform.  Id.; see also Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (discussing

burden of proof).

    In this case, the ALJ determined that plaintiff's claim could not survive the fourth

step of the analysis because, although plaintiff has the severe impairments of COPD and

borderline to low average intellectual functioning, she is capable of performing past

relevant work as a cashier/stocker, stock clerk and a shoe salesperson because "[t]his work does not require the performance of work-related activities precluded by the claimant's *residual functional capacity*." (Emphasis added). Plaintiff argues that the ALJ failed to comply with the applicable law in assessing her RFC and that this legal error requires remand for further consideration. The court agrees.

Social Security Ruling 96-8p, 1996 WL 374184, *7, provides in relevant part,

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

Symptoms. In all cases in which symptoms, such as pain, are alleged, the RFC assessment must:
* Contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;
* Include a resolution of any inconsistencies in the evidence as a whole; and
* Set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.

The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.

The ALJ determined that plaintiff had no exertional limitations but would need to avoid even moderate exposure to fumes, odors, dust, gases, and poor ventilation and would be limited to unskilled to semi-skilled work. However, the ALJ did not discuss plaintiff's ability to perform sustained work activity on a regular and continuing basis. The ALJ

16

also did not discuss the maximum amount of exertional work activities (standing, lifting, bending, etc.) plaintiff could perform during an eight-hour workday.  Social Security Ruling 96-8p requires the ALJ to discuss these topics when assessing plaintiff's RFC.  Moreover, the ALJ should cite medical facts and nonmedical evidence to support his RFC conclusion.  Though the ALJ did touch on, generally, some of these facts and evidence in other sections of his report, he should be sure to explicitly link these facts with the RFC assessment. The ALJ should also consider the medical evidence, including evidence of lower back pain noted by Dr. Shah, as well as all evidence regarding plaintiff's exertional limitations.

In his objection to the magistrate judge's finding, the Commissioner argues that the ALJ's determination that plaintiff could perform unskilled to semi-skilled work in which she would need to avoid even moderate exposure to fumes, odors, dust, gases, or poor ventilation implies that plaintiff could sustain work on a regular and continuing basis.  The Commissioner also argues that the ALJ's failure to address the maximum amount of work-related activities is of no moment because his finding of no exertional limitations is sufficient.  There is some authority for the proposition that implicit findings by the ALJ can suffice.  See Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006).  However, this authority does not excuse the ALJ's failure to comply with the specific requirements of Social Security Ruling 96-8p.

The ALJ's ultimate conclusion that plaintiff is not disabled may very well be correct.  However, the process by which the ALJ reached that conclusion was flawed, and that legal error precludes affirmance of his decision.  Accordingly, the appropriate action

is to remand this case for further consideration.

## IV.  CONCLUSION

For the foregoing reasons, it is **ORDERED** that the Commissioner's decision to

deny plaintiff disability benefits is **REVERSED** and this case is **REMANDED** to the

Commissioner for further proceedings consistent with this order.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT JUDGE**

**March 8, 2010**
**Charleston, South Carolina**